The first case for argument is Case No. 24-3144, Eastern District of Arkansas, Carolyn Arnett v. Larry Norris et al. Okay, Mr. Gerard. May it please the Court. A longstanding axiom of deliberate indifference law is that we must not use hindsight's perfect vision to judge the actions of state officials. That's tempting to do in this case because the perpetrator of the sexual assaults, the chaplain DeWitt, did plead guilty to criminal charges back in 2015. However, we must instead look to see what subjective knowledge these state officials had at the time. How big is this room, his office? We look through the record and two or three times the deponent says it's about the same size as this office or something like an office next door. It's a terrible record on that. How big is the office, for starters? There are photos in the record. I looked at the photos. Go ahead. Oh, okay. Is there anything better than what I just described, like this room and the photos? As far as dimensions? Yeah. How big it is? I would say it's, I would be estimating a 12 by 12, perhaps. And the same on the windows. Now, there are the two windows, right? There's one that's in the door and the one that's over to the side by the cabinet. There's not three windows, are there? That's correct, Your Honor. Correct. Some of the deposition gets squishy on that. Right. Those are the two windows, correct? Yeah. Not three. Two windows. Did anyone testify how much you can see over them? I did not see any testimony in the record about that. Because your images sure show areas above them where, let's say, a taller basketball player could certainly look in the room, I think. What can you tell is the logical inference from the photos? I agree, Your Honor. In fact... Well, what's your best evidence? That's a better way to ask the question. Certainly. What's your best evidence that someone could see around, over, through them or something? Best evidence is from Ms. Ornette herself. In fact, the only testimony we have from her regarding the windows can be found in the reasonable cause affidavit. And this is Volume 3, page 664 through 665 of the record. On page 665, her statement that she gave in an interview to officers on, I believe it was March 12, 2015, which is a few months after these assaults were first reported. She states at the top of page 665 that, let's see, Ornette stated that DeWitt would have her sit in the chair at the door so he could see if security was coming from both ways down the hall. So this indicates that you can, in fact, see in or out of these windows. What did the district court find? The district court held that there was record evidence that these windows were obscured up to three times per week. End of story, right? Is that the end of the story? The district court made a factual finding? We lack the jurisdiction, absent generally a video that contradicts it? Aren't we bound by that? I believe the evidence is to be viewed in light, most favorable to... We don't have jurisdiction to question the district court's factual findings, though. I mean, I think, disagree with me if you want, but I think that's fairly clear. So, you know, I get your point about the ambiguity in the testimony, but I don't see the ambiguity in the district court's findings. And if those two conflict, then we have another problem, I think, and that is, what do we do with the district court's factual findings? But feel free to disagree, but that seems to be where you're headed here. I certainly take your point, and I'm not sure that the reasonable cause affidavit conflicts necessarily with the district court's findings. The district court sort of left it open both ways. They said there's record evidence that perhaps both windows were obscured as such that you couldn't see in the room at all, or perhaps you could still see inside the rooms and therefore these officers would have seen the sexual assaults occurring. And if that's the case, don't you lose on appeal, either for lack of jurisdiction? In other words, isn't that a jury issue if the district court found, as a matter of fact, that there's a conflict, even a conflict on that? I would disagree, primarily because whether or not these windows were obscured, you know, however they were obscured, there is no reason for these officers to suspect that Kenneth DeWitt poses substantial risks to these women. There's no... To prevent rape in prisons, don't we also make reasonable inferences in favor of Ms. Arnett? I believe, I do believe you all, you can go by the court's factual finding that these windows were possibly, possibly, I'm sorry, partially obscured and still find in our favor. There is no evidence in the record, at least that the court pointed out, that these were only obscured at certain times of day or... But what is the evidence of subjective knowledge that the district court ruled on? I mean, I know it's defendant by defendant, we've got three of them here, but what did the district court say were the facts supporting the inference that your clients had subjective knowledge of the risk? The district court pointed out that officers Faust, Budnick, and Dykes had offices that were nearby Chaplain DeWitt's office, that they made regular rounds around the prison, and, yeah, for at least Dykes and Faust, it all hinges on this windows theory. For Budnick, there is the additional allegation about the incident where Budnick walked in, and Chaplain DeWitt was adjusting his pants and acting strangely. So if that's a factual dispute, I mean, how do you get around for Mr. Budnick? I mean, that is of a different character altogether than the windows. You have the windows for him, plus the fact that he allegedly witnessed the sexual assault or the aftermath of the sexual assault. That's clearly enough, isn't it? I would disagree. In Howard v. Atkison, this court held that a single incident or a series of isolated incidents usually provides an insufficient basis upon which to assign liability. Well, but this is an incident that is alleged to be a sexual assault, and the claim is failure to protect from sexual assaults. Correct. It's a weekly sexual assault. Right. At a specific time every week. Well, particularly with Budnick, he started working there in June of 2014. He was by far the least tenured person of these three defendants. Chaplain DeWitt resigned on September 10, 2014. So him and Budnick only overlapped by about three months or so. And of course, nobody, no person, not just the victims, but nobody reported anything about sexual misconduct regarding these three victims to any of these defendants. But we don't require that, do we? I understand that that might be helpful, right? No, we don't. I mean, but the inferences seem to be from the pervasive nature of the conduct and the repeated nature of the conduct. Our case law seems to allow an inference, and I forget the language, I think it's the state of Davis where it's like the team member's duties were such that each member would have had to be in a position to see the assaults. It would be impossible for them not to see. And that seems to be what the district court found here. And that seems permissible under our case law. And I'm just wondering if you disagree with kind of that proposition that there was enough evidence here to say they must have known. Not they should have known, but they must have known because they were there all the time. And they were close by all the time. And they had to have seen these windows obstructed. I wouldn't say must have known. There's record evidence in Arnett's deposition that these sessions lasted anywhere from 35 to 45 minutes. That they took place at 6 a.m. in the morning during the count when officers were busy conducting the count. So there's little activity in the hallways. And there's evidence that the female inmates were placed in this chair. As you can see in Volume 3, page 766, that picture of the office, that they were placed in a chair against the wall. And again, that Mr. DeWitt was looking both ways down the hallway to see if anybody was coming. So this was a man who was obviously trying not to get caught. And Ms. Villareal in her deposition stated that she wasn't trying to make noise or scream anything to try to get him caught. Counsel, if you're arguing over the sufficiency of the evidence, do we have jurisdiction to consider that? Well, I believe it can go towards, yes, I do believe so. I could be wrong. This is an interlocutory appeal. I don't think we can, I don't think we have jurisdiction over a sufficiency of the evidence argument. Oh, I see what you're saying, yes. I do believe that, I mean, okay, so it can be reviewed de novo, the law of the case. And I just believe the facts, as presented, even if we take everything the district court said to be true, there is no evidence for them to be put on notice that Kenneth DeWitt posed a substantial risk to these women. Now, my argument would be that... Counsel, was that even briefed? I don't know that that issue was briefed. Whether constitutional rights were violated if they did know and did nothing about it. I don't know that that was briefed. I'd have to refer back. I'll move on from that point and say that... Let's see. I'm sorry. I lost track of thought for a second. Okay. Again, it was briefed that the opinion relies on pure conjecture as to whether or not these officers stole inside the room. And it was briefed that, again, and I know it's not required, but it was briefed that these allegations did not surface until December of 2014 after DeWitt resigned from the ADC. You did have the sexual content complaint. Was that 2006-ish? And I have, back in 2002, there was... That was the DOJ inspection, whatever, audit or whatever they did. What DOJ? Investigation, they called it. If you're referring to... DOJ investigation. Thanks, Gerard. If you're referring to the DOJ investigation from 2003, only Warden Hobbs and Officer Kelly were implicated as having knowledge of that DOJ investigation. And, of course, we must look to the subjective knowledge of the defendants in this case. The district court makes detailed findings on the DOJ inspection about hidden areas and no cameras and that kind of stuff. Sure. Yeah. Sure. But if we compare this case to other Eighth Circuit decisions that were... And these are all cases that were cited in the record. For example, in Vandervender v. Sass, there was an inmate on inmate assault, and the prisoner had access to wooden 4x4s, even though this was against policy. And, of course, this court has held multiple times that internal policy violation is not equal to a constitutional violation. And there have been several other cases in the record where the officers were put on notice explicitly that this type of conduct was occurring. Whether an inmate was a threat to another inmate, this was verbally reported to the officers. Again, I agree that that's not required in every instance. However, considering that this was a chaplain that worked for the ADC since, I believe, 2001, and these allegations, yes, 2002, Marcy Coburn said that she had a baby with DeWitt prior to entering the ADC. Nothing came of that. And, again, that was 2002, before, I believe, two out of these three defendants even started working for the ADC. 2006, there was a complaint about his teachings in the areas of impure thoughts. At most, this is archaic teachings. And they said sexual content, right? Because they said they had sexual content, these religious teachings. Sure, and he would teach about impure thoughts. Their menstrual cycles were mentioned, how masturbation isn't allowed, things like that. Of course, I would argue that's not evidence that he would sexually assault anybody. I mean, I think that's a far cry. And October 2014, as far as, again, to wrap up these allegations of misconduct, October 2014 was in regards to using an inmate's money card without her permission. And I will reserve the remainder of my time for rebuttal. Thank you. You may.  Sorry. And, by the way, it will be a minute. Unless you have any further questions. I'm sorry. Of course. Right now. But it will be a minute, by the way, on the clock. Oh, okay. Thank you. Just so you know what the clock will say. Thank you. Mr. Lowe. Good morning. May it please the Court, Counsel. Well, I think that this esteemed bench has zeroed in on the issues quite well, as always. The question presented to the bench, I think, this morning is, will Carolyn Arnett, who is now a grandmother, a woman who has been in prison for a long time for indirect involvement in a crime, will she be allowed to tell the sad story of her abuse to an Arkansas jury? Will she get a chance to talk about the regular, methodical sexual assault incidents that occurred week in, week out, over the course of four years? Every week, every month, year in, year out, for four years. Does she get a chance to plead her case? And the district court below very thoughtfully answered that question in the affirmative. And the Court's voluminous and well-cited order really puts meat on the bones of the issue here and shows why this case has merit. Counsel, I'm sorry. What is the evidence in the record that put the defendants on notice that there was sexual misconduct or a risk of sexual misconduct? I take it that the DOJ investigation is there. That's quite a bit before, as a matter of time. There were, as Counsel mentioned, the allegations of the content of the teaching. That's not directly of a sexual nature. It's not necessarily indicative of sexual assault. I guess we have the evidence from two other victims. Is that correct? Yes. Am I missing? I guess what I'm wondering is the windows aren't a big deal in the case, it seems to be. And I'm wondering, the windows don't directly implicate sexual assault either, although you may have a response to that. So I'm wondering where is the knowledge, the subjective knowledge of sexual assault in the record? Specifically. Correct. So your Honor is correct. The windows issue is really a big issue here. And it's not just because of what could possibly be seen through those windows, but the obscuring of those windows are red flags for a very particular type of misconduct at an all-women's facility, especially with male unattended staff members. And that is articulated in the PREA statute. And even if a violation of PREA doesn't constitute in and of itself a violation of the Constitution, it certainly puts on notice or attaches the issue to the regulation or to the violation. It shows what they are guarding against. Any reasonable supervisor who sees women go into an office regularly every morning or every week and sees subsequently windows become obscured for the next 45 minutes or so, over the course of weeks, over the course of months, and indeed years, that should put and indeed does put a reasonable supervisor on notice. Is there any direct evidence that any of the three defendants actually saw obscured windows? Direct evidence? I believe that Deputy Faust admitted to seeing that. She might have said she didn't recall. None of them testified unequivocally that that never happened. Did the district court make findings on that particular issue? The district court made the finding that, based on the record of evidence, is certainly in the light most favorable to the non-movement. But there was an inference, right? That was what the district court found. That there was an inference that they would have seen or must have seen the windows? I mean, I don't think the district court found that they actually did. I think there was testimony from Leticia Villarreal. Right, I'm talking about a finding, not the testimony. I switched horses there, so. I think that the district court found specifically that, well, I do believe, no, so I don't believe the district court found that any of the defendants had firsthand visuals of what was going on inside. You know, but the thing here is the totality of the circumstances and all of the red flags that were up. And what does that, what kind of duty does that, what kind of duty attaches to a reasonable supervisor in those circumstances? I thought the district court did say that one of the defendants did see the windows obscured. But you correct me because I'm searching for it and don't see it. Well, I will certainly. There's lengthy findings, as you know. I will certainly defer to Your Honor on that particular.  Don't, because I can't find it. I didn't want to misspeak. I do believe that there is evidence of that. I was kind of going that way with Judge Kobus, but I didn't want to overcommit. Again, this is about the totality of the circumstances. My counsel, my friend here, counsel, talked about judging in hindsight at the beginning of his remarks. This is not hindsight. This is plain sight. What was going on here was within plain sight for any reasonable supervisor or staff person to say, hey, what's going on here for four years? What, if anything, do we make of the affidavits submitted by 14 other employees that basically say, hey, we were there too and we didn't have a clue? Did that play into the district court analysis, and should it play into ours at all? All of those affidavits, by the way, were from people who were not disclosed during the case in chief, never disclosed in Rule 26 disclosures. But they're in the record, aren't they? But they are in the record, and the court, I think, cited to each of them, but I think correctly took them with a grain of salt because those were, after the fact, self-serving affidavits that really don't touch upon any of the culpability. They weren't self-serving in the sense that none of these individuals were named as defendants, correct? And if we're talking about a reasonable person must have known what was going on based on proximity and the other facts found by the district court, and then you've got 14 arguably reasonable people saying we didn't know, doesn't that undermine the district court's inferences? Well, not at all. I think that when I say that they're self-serving, I mean that those are inherently biased witnesses, all of whom work for the ADC. I don't remember their affidavits chapter and verse, but I don't recall any specificity in there that would support any position that they were in the right place at the right time, or if they were within proximity, or even on the same floor. So I think the court wisely addressed those in the order so as not to appear that they weren't reviewed, but I think that was correctly in passing, and it really bears nothing on the evidence that Plaintiff has brought forth. This was conspicuous failure to protect evidence. He did it weakly. He did it with two other women. So this guy had, on three times a week, had three different women delivered to him. He then obscured his windows week in, week out, month in, month out for four years. And yes, these victims did not make formal complaints at the time for reasons that are obvious, but these types of cases inherently there's no complaint because it boils down to what can we deduce and what does a reasonable supervisor see when there's not a complaint. When there's a complaint made, well, then the game's over hopefully, right? To what extent do credibility determinations by the district court come into play? I don't think that the court really made any credibility determinations. I think that the question is whether the defendants can show that there was not any disputed material facts in this case. I think the judge looked at all the facts and laid them out and said- There were several of the defendants who said, I never saw these windows obscured despite close proximity over weeks and months and years. So the judge must not have believed it. I think that the court, if anything, was weighing that testimony against the evidence, against evidence of the circumstances and whether it's credible to say I didn't see something when it's within a few feet of you. So I think what she said, the district judge, was these bits of evidence are in conflict and that conflict should be resolved by a jury. The jury should be able to say, you know, I think that that was too close in proximity for this guy not to see something. What issues, if any, do we have jurisdiction over here? Well, you know, I tend to agree with the court regarding the factual nature of this appeal. And, you know, I think that a motion to dismiss could have been filed based on the court's findings of fact. I think this court, you know, I guess I would say respectfully, you know, with utter respect, I don't think that this court really has jurisdiction over the factual basis of this appeal because it's strictly a do-over motion. They, you know, they are contesting the finding of facts by the judge, and that's not appropriate for an appeal. So I don't think that there is proper jurisdiction to hear this appeal based on that fact. If this court were to have jurisdiction over this appeal, well, then certainly the court is free to rule as it sees fit. We don't think that defendants have produced anything that would bring into question the sound reason of the district court, the methodical, you know, analysis underwent by the district court, you know. There are other aspects of this issue, too. You know, the prior instances of sexual misconduct, I'm not sure that they have to be prior sexual assaults. I think in a situation where you have a chaplain, a trusted chaplain at an all-women's facility who has got incredible autonomy, it's got autonomy that nobody has here. This guy walks the halls by himself. He's got his son, I believe, is a correctional officer. So if his son saw something inappropriate, his son would be put in the position of having that conflict of whether to report his father. Not to mention this guy was the spiritual advisor for the whole place, all of the employees and staff members. So if they ever caught wind or had a reason to think that he was doing something unseemly, that would be a tremendous conflict because he was their spiritual advisor. He might have been the guy that talked them through a divorce or through a child's death or something. And to put somebody in that position and to give them that type of power and unchecked autonomy is a recipe for destruction, and that's what happened here. So I think the issue here is how many cracks in the dam have to be identified by reasonable supervisors before they realize that the whole thing is going to blow up. These victims were damaged in ways that you can't even describe, not just physically and mentally, but just their whole system of trust and their incarceration. And they're already doing time, and they're already having a rough go at it. So I think that your honors are correct to the extent that you've really focused here on the factual disputes and the facts that the court found from the record. The jury might reject those facts. The jury might say, we don't buy it. But we definitely believe this is one of those cases where we say, you know, let them play, coach, because we produced the facts. We did what we were supposed to do, we think, in the lower court. And that would be all that I have for this morning, and I certainly think the bench will discuss it. I do want to ask you about Dykes. That's what I was confused about. Yes, sir. It is true that Faust and Budnick, I believe, deny ever seeing the windows or anything, just flat-out right denials. But as for Dykes, it says Dykes made rounds, and it's his responsibility to see if they were. Then the district court doesn't continue that, doesn't say whether he saw or didn't saw them obscured. Now, I know I just read it. I know we're limited there. Was he even asked the question at the deposition? Linda Dykes, she was asked the question regarding whether she saw the windows. But I believe that none of them would admit to seeing the windows obscured. But it's her job to go around. I'm sorry? She must have said she didn't see them then, right? Is that the thing? Well, you know, I think I mentioned it. The judge doesn't make any finding on that, I don't think. Well, I think that I mentioned that in the motion summary judgment response brief. I do see the part that you're referring to when you say Dykes was also charged with performing routine safety checks. Right, right, correct. It does not indicate. I don't think the judge made that particular finding.  I don't think that that's problematic to the challenge of this appeal, however. Okay. Thank you very much. Thank you very much, Your Honor. Okay. Mr. Shor. Okay, thank you. I'll make it quick. Okay. So, as Mr. Lau said, trusted chaplain, spiritual advisor, people, as he said, would be unwilling to turn him in. Exactly. And that's why these, that's more evidence on our side that these three defendants wouldn't have evidence of misconduct even if somebody knew about it. He said unwilling to turn him in, which implies that there was, they knew something, that some misconduct that would justify turning him in but hesitated not. If somebody else knew, they, according to him, they wouldn't have told perhaps the deputy warden or defendant. Can I ask you, what is the legal question you think this court should decide in order to rule in your favor? Sure, and that brings me to my point about jurisdiction. This court does have jurisdiction to determine whether law was clearly established in this case, what was known to a person who might be shielded by qualified immunity, and the reasonableness of the defendant's actions. And if we go by the factual findings, as we must from the court, it is true that, as the court inquired about earlier, there was no actual direct evidence. The court did find that. They based their opinions about the windows, or I'm sorry, their findings about the window obscurity from Bill O'Reil's deposition alone. And they admit to this. They cite to her and use that as a basis for the methods that were used. However, there's nothing in the record from Arnett's deposition, and McCool actually didn't participate at all in the investigation. So the court did find that. Excuse me, you're over your time. But as long as Judge Kogut is inquiring, we'll continue. Have you had an answer? Any further questions? Listen, thank you for your argument here today. Thank both counsel for the argument. Case number 24-3144 is submitted for decision by the court. Ms. Gillis, please come forward.